UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 03 Civ. 3816 (RJS)

———————————

ENZO BIOCHEM, INC., *et al.*,

Plaintiffs,

VERSUS

MOLECULAR PROBES, INC.,

Defendant.

———————————

No. 03 Civ. 3819 (RJS)

———————————

ENZO BIOCHEM, INC., *et al.*,

Plaintiffs,

VERSUS

ORCHID BIOSCIENCES, INC.,

Defendant.

———————————

MEMORANDUM AND ORDER
December 6, 2013

———————————

RICHARD J. SULLIVAN, District Judge.

Plaintiffs Enzo Biochem, Inc. and Enzo Life Sciences, Inc. (collectively, "Enzo") bring these actions against Defendants Molecular Probes, Inc. ("MPI") and Orchid Biosciences, Inc. ("Orchid" and, collectively with MPI, "Defendants") for patent infringement, state-law tortious interference, and unfair competition under both state and federal law. Now before the Court are Defendants' motions for summary judgment

as to Enzo's non-patent claims, as well as MPI's motion for summary judgment of non-infringement as to Enzo's Patent No. 5,241,060 (the "'060 Patent"). For the reasons set forth below, the Court grants Defendants' motions.

## I. BACKGROUND

### A. Facts[1]

All three of the parties – Enzo, MPI, and Orchid – are biotechnology companies involved in the research, development, manufacture, and sale of biotechnology products. (J. Comp. ¶¶ 6–17.) Effective January 1, 1999, Enzo entered into a distribution agreement with PerkinElmer, another biotechnology company, under which PerkinElmer would manufacture, sell, and distribute certain designated products (the "Products").[2] (Decl. of John J. Elliott, dated May 1, 2013, 3816 Doc. No. 107, 3819 Doc. No. 93 ("Elliott Decl."), Ex 3.) Pursuant to that agreement (the "PE Agreement"), MPI and Orchid were appointed to serve as PerkinElmer's sub-distributors of the Products. (*Id.* Ex. 3 at Ex. E; *see also id.* Ex. 4 (notifying MPI of its appointment), Ex. 5 (notifying Orchid).) However, it should be noted that there was no contract between Enzo and either of the Defendants. (*See* MPI 56.1 Stmt. ¶¶ 15, 16; Orchid 56.1 Stmt. ¶¶ 19, 35.)

The PE Agreement limited the purposes for which the Products could be used or sold by PerkinElmer and its sub-distributors, explicitly restricting the Products' use to "Research End-users" in the "Research Market." (Elliott Decl. Ex. 3 § 1.) Subsequent to their appointments as sub-distributors, MPI and Orchid engaged in product-development research and sales involving the Products. (*See id.* Ex. 7 at 63:23–64:7; *id.* Ex. 8 at 88:1–89:10, 149:9–150:13, 160:2–162:23, 184:10–186:8, 187:6‑9; *id.* Ex. 9 at 178:5–14, 196:18–197:13). Moreover, in at least some instances, Orchid failed to include labels indicating the use of Enzo's intellectual property, in violation of PerkinElmer's labeling obligations under the PE Agreement. (Elliott Decl. Ex. 3 § 1.g; *id.* Exs. 122, 123.)

Additionally, at some unspecified time, MPI developed and/or sold ULYSIS Nucleic Acid Labeling Kits (the "ULYSIS Kits"), which apply fluorescent labels to designated strands of genetic information known as oligo- or polynucleotides. (Patent 56.1 Stmt. ¶¶ 17–18, 20–22.) During the same time period, Enzo held the '060 Patent, which, in relevant part, covers "labeled mononucleotides." (*Id.* ¶ 3; Decl. of Eric M. Jaegers, dated July 22, 2013, 3816 Doc. No. 122 ("Jaeger Decl."), Ex. 3 at Col. 31:14–28 (Claim 1 of the '060 Patent).)

### B. Procedural History

Enzo commenced these actions by filing complaints against MPI and Orchid on May 28, 2003, asserting patent infringement,

---

[1] The facts are taken from the parties' Local Civil Rule 56.1 statements and the declarations and exhibits submitted in connection with this motion. General citations to the 56.1 statements for each motion ("MPI 56.1 Stmt.," "Orchid 56.1 Stmt.," and "Patent 56.1 Stmt.") refer to undisputed facts in the final joint statements of the parties (03 Civ. 3816, Doc. ("3816 Doc.") Nos. 106, 129; 03 Civ. 3819, Doc. ("3819 Doc.") No. 91). In deciding this motion, the Court has also relied on the complaints in the two cases, which are substantively identical and are thus cited jointly ("J. Compl."), as well as Defendants' memoranda in support of their motions ("MPI Mem.," "Orchid Mem.," and "Patent Mem."), Enzo's opposition briefs ("MPI Opp.," "Orchid Opp.," and "Patent Opp."), and Defendants' replies ("MPI Reply," "Orchid Reply," and "Patent Reply").

[2] NEN Life Sciences was acquired by PerkinElmer on an unspecified date in 2000. (J. Compl. ¶ 13.) The Court uses only the name of NEN Life Science's successor, PerkinElmer.

state-law tortious interference with business relations, state-law unfair competition, and unfair competition under Section 43(a) of the Lanham Act.[3] (3816 Doc. No. 1; 3819 Doc. No. 1.) The cases were originally assigned to the Honorable John E. Sprizzo, District Judge, but after he passed away in December 2008, the case was reassigned to my docket on January 8, 2009. (3816 Doc. No. 29; 3819 Doc. No. 25.) From March 13, 2009 until August 25, 2011, this action was stayed while a related case was appealed to the Federal Circuit. (3816 Doc. Nos. 34, 55, 57; 3819 Doc. Nos. 30, 51, 54.) Then, on September 24, 2012, the Court granted in part and denied in part a motion for summary judgment filed by MPI, Orchid, and defendants in four related cases with respect to multiple patent claims asserted by Enzo. (3816 Doc. No. 73; 3819 Doc. No. 67.)

MPI and Orchid filed the instant motions for summary judgment on Enzo's non-patent claims on April 11, 2013. (3816 Doc. No. 101; 3819 Doc. No. 86.) After receiving leave to conduct additional discovery ahead of the motions, Enzo filed its opposition on May 1, 2013. (3816 Doc. No. 105; 3819 Doc. No. 90.) MPI and Orchid replied on May 15, 2013. (3816 Doc. No. 113; 3819 Doc. No. 97.) On July 22, 2013, MPI filed its motion for summary judgment of non-infringement as to the '060 Patent, on the grounds that Enzo's May 6, 2013 statements about the patent to the U.S. Patent and Trademark Office (the "PTO") foreclosed Enzo's infringement claim against MPI's ULYSIS Kits. (3816 Doc. No. 119.) Enzo filed its opposition on August 12, 2013 (3816 Doc. No. 126), and MPI replied on August 19, 2013 (3816 Doc. No. 131).[4]

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that it is entitled to summary

---

[3] Enzo now seeks to assert claims against MPI and Orchid for breaching contracts of which Enzo was a third-party beneficiary. (MPI Opp. at 18–19; Orchid Opp. at 21–22.) As the Court has made abundantly clear, however, it will not entertain new claims from Enzo at this late stage. *SeeEnzo Biochem, Inc. v. Amersham plc*, No. 02 Civ. 8448, 2013 WL 5943985 (RJS), at *5–6 (S.D.N.Y. Oct. 22, 2013) ("To date, Enzo has not sought leave to [amend its complaint], and at this point, even if Enzo did seek leave to amend, the Court would deny the request. After more than a decade of wrangling and *multiple* bites at the discovery apple, Enzo will not be permitted to assert new claims based on new factual assertions that would effectively commence a new lawsuit."); *see also Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)) (reaffirming that a party may not use opposition to a dispositive motion as a means to amend its complaint); *Enzo Biochem, Inc. v. Molecular Probes, Inc.*, 03 Civ. 3816 (JES) (S.D.N.Y. July 18, 2007) & *Enzo Biochem, Inc. v. Orchid Biosciences, Inc.*, 03 Civ. 3819 (JES) (S.D.N.Y. July 18, 2007) (warning Enzo that its "[p]leading[s] set forth [its] claim," and that it would not be permitted to plead a specific breach of contract "and then [to] argue every possible breach of contract [it could] think of . . . . [Enzo had] to describe with some specificity the kind of claim [it was] asserting. . . . Otherwise, [there would be] no purpose to seek leave to amend if [it] could just amend willy nilly . . . .").

[4] Enzo's brief in opposition was styled as a cross-motion for partial summary judgment as to the validity of the '060 Patent. Because Enzo had not requested leave to file its own summary judgment motion, and because the Court had approved briefing on the narrow issue of the legal effect of Enzo's statements before the PTO, the Court struck Enzo's cross-motion and directed MPI to confine its reply to Enzo's statements to the PTO and the effect of those statements on Enzo's infringement claims. (3816 Doc. No. 130.)

judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted) (alteration in original).

### III. DISCUSSION

MPI's and Orchid's motions as to non-patent claims implicate the very same legal issues, so the Court will address those motions together. The Court will then turn to MPI's separate motion for summary judgment as to Enzo's remaining patent infringement claims.

#### A. Non-Patent Claims

Enzo brings claims against MPI and Orchid for tortious interference as well as state and federal unfair competition. Enzo's legal theories are largely incongruous with the facts in the record. Indeed, Judge Sprizzo warned Enzo that it was treading dangerously close to sanctionable behavior by bringing such legally untenable claims. (*See* Tr. of July 18, 2007 Conf. at 307:8–16.) Nevertheless, the Court will address each of Enzo's non-patent claims in turn.

#### 1. Tortious Interference

Enzo alleges that MPI and Orchid interfered with a business relationship between Enzo and PerkinElmer. Specifically, Enzo contends that Defendants induced PerkinElmer to breach the PE Agreement by purchasing Products from PerkinElmer for non-research uses, which violated the use-restrictions in the PE Agreement. (*See* J. Compl. ¶ 75.) As a preliminary point, the Court notes that the complaints in both of these actions alleged "tortious interference with business relations" (*id.* at ¶ 73), but that Enzo now argues a different legal theory, "tortious interference with contract," which implicates materially different elements (MPI Opp. at 16; Orchid Opp. at 22–23). This shift, characteristic of Enzo's litigation strategy in other cases, *see, e.g.*, *Amersham plc*, 2013 WL 5943985, at *4–5, has caused some confusion in the parties' briefing.[5] Regardless, the record does not support either theory against either Defendant.

A claim of tortious interference with business relations under New York law requires a plaintiff to prove that: "(1) there [was] a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interfere[d] with it; (3) the defendant act[ed] with the sole purpose of harming the plaintiff, or, failing that level of malice, use[d] dishonest, unfair, or improper means; and (4) the relationship [was] injured." *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997). The third

---

[5] Vexingly, Enzo contends that "Orchid arguably does not even seek summary judgment on [Enzo's] actual claim" of tortious interference with contract because Orchid focuses on tortious interference with business relations. (Orchid Opp. at 23.) Given that *Enzo* pleaded tortious interference with business relations (J. Compl. ¶ 73), Orchid can hardly be blamed for briefing that cause of action.

element represents a particularly high hurdle, for it requires a plaintiff to show that the defendant "committed a 'crime or an independent tort [such as fraud],' or [acted] 'for the sole purpose of inflicting intentional harm'" on the plaintiff. *Plasticware, LLC v. Flint Hills Resources, LP*, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (quoting *Carvel Corp v. Noonan*, 785 N.Y.S.2d 359, 361 (2004)). Moreover, a reasonable juror could not find malice or improper means where a defendant has a "legitimate economic self-interest" in its putatively interfering conduct. *See Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 412 (S.D.N.Y. 2011) (citation omitted).

Here, there is no evidence that MPI or Orchid sought to harm Enzo or utilized unlawful means to interfere in Enzo's relationship with PerkinElmer. To the contrary, the only relevant evidence as to Defendants' intent and means shows that MPI had been purchasing the Products from PerkinElmer for roughly five years before the PE Agreement. As such, the evidence directly refutes any inference that MPI purchased or used the Products from PerkinElmer to hurt Enzo. (MPI 56.1 ¶ 17.) Likewise, Enzo fails to make any record of malicious intent or improper means by Orchid, which was purchasing the Products from PerkinElmer, evidently, with no thought whatsoever to Enzo. In any event, by focusing exclusively on tortious interference with contract against MPI and Orchid, Enzo effectively concedes that Defendants are not liable for tortious interference with business relations. (*See* MPI Opp. at 16–18; Orchid Opp. at 22–23); *see, e.g.*, *Rylott-Rooney v. Alitalia-Linee Aeree Italiane SpA*, No. 07 Civ. 11091 (JSR), 2009 WL 37817, at *2 n.1 (S.D.N.Y. Jan. 6, 2009) (noting that, to the extent a plaintiff does not argue a claim in its brief, "any such argument has been waived").

Enzo's shift to a claim for tortious interference with contract is equally unavailing. Under New York law, such a claim requires "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third[ ]party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.S.2d 76, 82 (1996)). Notably, with respect to the third element, it is not enough that a defendant simply engaged in behavior with a third party that constituted a breach of the contract between the third party and the plaintiff; the defendant's subjective goal must have been to procure the breach. *See High Falls Brewing Co., LLC v. Bos. Beer Corp.*, 513 F. App'x 12, 13 (2d Cir. 2013) (citing *White Plains Coat & Apron Co. v. Cintas Corp.*, 835 N.Y.S.2d 530, 532 (2007)); *see also id.* at 13–14 (requiring that "the target of [defendant's] conduct was [the third party's] contractual arrangements with" the plaintiff). Put simply, a defendant must have specific intent to interfere with the relevant contract. *See American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F. Supp. 597, 608 (S.D.N.Y. 1971) (citing *Lamb v. S. Cheney & Son*, 125 N.E. 817, 818 (N.Y. 1920)).

Although the parties do not dispute MPI's and Orchid's knowledge of the PE Agreement, Enzo does not establish the element of intent to procure a breach. As noted above, MPI had been purchasing Products from PerkinElmer for roughly five years before the PE Agreement (MPI 56.1 Stmt. ¶ 17), and there is no evidence that either MPI or Orchid gave any thought to the effect that their business relationships with PerkinElmer might have on Enzo's

5

contractual arrangement with PerkinElmer. Indeed, Enzo's only evidence of intentional procurement is Defendants' knowledge of the PE Agreement. (*See* MPI Opp. at 16–17; Orchid Opp. at 23.) This gap in the evidence is fatal to Enzo's claim, because MPI's and Orchid's mere knowledge of the PE Agreement does not support an inference that the target of their conduct was to induce PerkinElmer to breach the PE Agreement.[6] Because Enzo offers no evidence that would support the inference that either Defendant intentionally induced PerkinElmer's putative breach of the PE Agreement, the Court grants summary judgment in favor of Defendants on this claim.

2. Unfair Competition – State Law

Enzo also asserts that MPI and Orchid engaged in state-law unfair competition by "misappropriat[ing] Enzo's valuable business, products[,] and technologies," specifically by causing PerkinElmer to breach the PE Agreement and, in turn, using Products purchased from PerkinElmer for non-research purposes. (J. Compl. ¶ 64.) Nowhere in its allegations does Enzo come close to stating a claim for unfair competition, however, nor does the evidence bear out such a claim against MPI or Orchid.

New York has "long recognized two theories of common-law unfair competition:

palming off and misappropriation." *ITC Ltd v. Punchgini, Inc.*, 850 N.Y.S.2d 366, 372 (2007) (answering the Second Circuit's certified question with respect to the reach of a claim for unfair competition) (citations omitted). "Palming off" is the "sale of the goods of one manufacturer as those of another," which is neatly illustrated by a "defendant [who] substitute[s] its product for plaintiff's when customers specifically asked for the plaintiff's product." *Id.* at 372, 372 n.2 (quotation marks, citations, and alterations omitted). The related theory of "misappropriation" relies on the "principle that one may not misappropriate the results of the skill, expenditures and labors of a competitor" and is best illustrated by a defendant's arrogation of the goodwill of the plaintiff by using the plaintiff's name, trademark, or trade dress. *Id.* at 372–73. The essence of both of these claims is that a "defendant assembled a product which bears so striking a resemblance to the plaintiff's product that the public will be confused as to the identity of the products." *Shaw v. Time-Life Records*, 379 N.Y.S.2d 390, 395 (1975) (citations omitted); *see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) ("The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." (quotation marks, citations, and alterations omitted)).[7]

---

[6] Enzo's arguments to the contrary are based on a misreading of non-binding case law from this District. Specifically, Enzo relies on *Don King Productions v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990), in which Judge Sweet noted that evidence that a "defendant . . . interfere[d, with] knowledge of the *existence* of the contract . . . , may suffice to imply malice." *Id.* (citing *American Cyanamid*, 331 F. Supp. at 608) (quotation marks and citation omitted). However, in *Douglas*, Judge Sweet's formulation was predicated on an earlier determination that there was, in fact, sufficient evidence to infer that the defendant "acted intentionally to induce [the] breach." *Id.* at 772, 774.

[7] Enzo selects language from Second Circuit opinions to imply that a cause of action for unfair competition reaches further than it actually does. Enzo insists that unfair competition law is "broad and flexible" (MPI Opp. at 8 (citing *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197–98 (2d Cir. 2001)) and that New York courts thus entertain claims for an "incalculable variety" of unfair business practices (*id.* at 8–9 (citing *Roy Export Co. Est. of Vaduz, Lichtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982))). Although, prior to the New York Court of Appeals' holding in *ITC Limited*,

In light of the nature of this cause of action, Enzo is clearly trying to hammer square pegs through a round hole. The heart of its claims is that MPI and Orchid bought labeled nucleotides from PerkinElmer and, in so doing, misappropriated Enzo's intellectual property rights over such nucleotides and caused PerkinElmer to breach the PE Agreement. (*See, e.g.*, MPI Opp. at 10 ("MPI sold [the Products] for non-research[-]only use, and used [the Products] to develop and exploit other MPI products, in direct contravention of its obligations [under the PE Agreement] as a sub-distributor of PE."); Orchid Opp. at 12 ("Orchid also engaged in unfair competition by passing off Enzo's proprietary reagents as its own."), 16 ("To the extent Orchid conducted research using Enzo ddNTPs, it was 'product development research' conducted to develop a commercial business, which was not a permitted use [under the PE Agreement].")) These claims have nothing whatsoever to do with either Defendant misappropriating Enzo's good will with consumers or passing off MPI or Orchid goods under Enzo's name. Enzo is clearly focused on protecting its patent rights and vindicating its contract rights, but this cause of action is not a proper vehicle to do either of those things.[8] Accordingly, the Court grants summary judgment in Defendants' favor with respect to Enzo's state-law claim for unfair competition.

3. Unfair Competition – Federal Law

Finally, Enzo argues that MPI and Orchid engaged in unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). (J. Compl. ¶ 68.) This federal cause of action does not support Enzo's theory, because the Lanham Act protects the producer of tangible goods, and in this case, Enzo did not produce the goods in question.

"Section 43(a)(1)(A) of the Lanham Act makes actionable any commercial representation that is likely to cause confusion 'as to the origin' of goods." *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300, 1306 (Fed. Cir. 2009) (quoting 15 U.S.C. § 1125(a)(1)(A)). The Supreme Court has held that the "'origin' of 'goods' . . . is the producer of the tangible product sold in the marketplace . . . . [A]s used in the Lanham Act, the phrase 'origin of goods' is . . . incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain." *Dastar Corp. v. Twentieth*

---

Second Circuit dicta broadly construed the cause of action for unfair competition, *see, e.g.*, *id.*, it is now clear that "[t]he tort is not all-encompassing," *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, No. 12 Civ. 3648 (SJF)(ETB), 2013 WL 1911434, at *10 (E.D.N.Y. May 7, 2013). To the contrary, "in rejecting the notion that unfair competition is equivalent to the amorphous term 'commercial unfairness,'" the New York Court of Appeals "has stated that misappropriation of another's commercial advantage is a cornerstone of the tort." *Id.* (quotation marks and citations omitted); *accord Randa Corp. v. Mulberry Thai Silk, Inc.*, No. 00 Civ. 4061 (LAP), 2000 WL 1741680, at *4 (S.D.N.Y. Nov. 27, 2000); *see also Ruder & Finn v. Seaboard Sur. Co.*, 439 N.Y.S.2d 858, 862 (1981) ("[T]he . . . phrase 'unfair competition' is not to be equated with the far more amorphous term 'commercial unfairness.'").

[8] An unfair competition claim cannot protect patents. *See Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 781 n.4 (2d Cir. 1964) ("[S]tates cannot, under the guise of regulating unfair competition, grant what is in effect patent protection . . . ." (citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964))); *accord Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir. 1979). To the extent that Enzo seeks to vindicate its contract rights, it could file a breach-of-contract claim against PerkinElmer, which it has done, *see Enzo Biochem, Inc. v. PerkinElmer, Inc.*, 03 Civ. 3817 (RJS), 2013 WL 5943987 (S.D.N.Y. Oct. 28, 2013), or it could file a claim against any entity that tortiously interfered with that contract, which it has also done but to no avail, *see* Section III.A.1.

7

*Century Fox Film Corp.*, 539 U.S. 23, 31–32 (2003). That is, "the author of ideas . . . is not the origin of goods" if the author is not also producing those goods in tangible form. *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 601 (S.D.N.Y. 2007) (quotation marks and citation omitted).

Enzo argues that Orchid "reverse passed off" Enzo's goods as its own, in violation of Section 43(a) of the Lanham Act, and that MPI – in some unspecified way – also violated Section 43(a). (Orchid Opp. at 16–20; MPI Opp. at 15–16.) But once again, Enzo fails to grasp the crux of its chosen cause of action. Enzo's claim under the Lanham Act, indeed, the bulk of its case against these Defendants, is predicated on Defendants' purchases from PerkinElmer of the Products – which PerkinElmer produced. (MPI Opp. at 3–4; Orchid Opp. at 4–5.) Enzo thus concedes that, at most, it was "the author of the *concepts* embodied" in the Products and a party to the PE Agreement by which PerkinElmer would manufacture the Products and distribute them. (Orchid Opp. at 17 (emphasis added).) As such, there is no evidence in the record that Enzo was the "producer of the tangible product sold in the marketplace," which is fatal to Enzo's Lanham Act claim. *Dastar*, 539 U.S. at 31–32 (2003). Since Enzo was not the origin of the goods, Section 43(a) offers Enzo no protection. *See* 15 U.S.C. § 1125(a)(1)(A).[9] Accordingly, this claim cannot survive, and the Court grants summary judgment in favor of Defendants with respect to Enzo's Lanham Act claim.

B. Non-Infringement of Enzo Patent No. '060

Based on Enzo's statements before the PTO on May 6, 2013, MPI separately moves for summary judgment as to Enzo's infringement claims against MPI's ULYSIS Kits. The relevant claim of the '060 Patent – Claim 1 – refers to the labeling of a *single* nucleotide.[10] (*See* Jaegers Decl. Ex. 3 (the

---

[9] Enzo contends that it is the "origin of the goods" based on its role in the PE Agreement. (*See* Orchid Opp. at 16–17; *see also* MPI Opp. at 15–16 (briefly addressing Lanham Act claim).) In support of this contention, Enzo points to a passage in *Dastar* in which the Supreme Court stated:

> The [origin] concept might be stretched . . . to include not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ("stood behind") production of the physical product. But as used in the Lanham Act, the phrase "origin of the goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain.

*Dastar*, 539 U.S. at 31–32. Leaving aside the fact that *Dastar* is focused squarely on limiting the term "origin" to the "producer of tangible products" and not "the person or entity that originated the ideas or communications that 'goods' embody or contain," *id.*, there is also insufficient evidence in the record to suggest that Enzo was a "trademark owner who commissioned or assumed responsibility [or stood behind] production" of the Products, *id.*, or that it marketed, labeled, or distributed them, *see Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 437–38 (4th Cir. 2010).

[10] Claim 1 covers:

> A nucleotide having the formula PM-SM-BASE-Sig wherein PM is a phosphate moiety, SM is a sugar moiety, BASE is a pyrimidine, purine or 7-deazapurine moiety, PM being attached at the 3' or the 5' position of SM when the nucleotide is a deoxyribonucleotide and at the 2', 3' or 5' position when the nucleotide is a ribonucleotide, BASE being attached to the 1' position of SM from the $N^1$ position when BASE is a pyrimidine or the $N^9$ position when BASE is a purine or a 7-deazapurine, and Sig is covalently attached to BASE at a position other than the $C^5$ position when BASE is a pyrimidine, at a position other than the $C^8$ position when BASE is a purine and at a position other than the $C^7$ position when BASE is a 7-deazapurine and wherein Sig represents a detectable moiety.

(Jaegers Decl. Ex. 3 at Col. 31:14–28.)

8

'060 Patent), Ex. 8 (excerpt of Enzo's Dec. 13, 2011 infringement contentions relating to the ULYSIS Kits); *see also id.* Ex. 2 at Ex. 1 (Enzo's Dec. 13, 2011 list of infringing products by claim).[11] By contrast, MPI's ULYSIS Kits, which Enzo accuses of infringing Claim 1, label "DNA, RNA, PNA" and other oligonucleotides and polynucleotides which – as their prefixes suggest – are *not* single nucleotides. (Jaegers Decl. Ex. 8; *see also, e.g.*, *id.* Ex. 5 at 391:19–392:1 (Victoria Singer deposition describing the fluorescence of the entire "nucleic acid" in ULYSIS Kits); *id.* Ex. 9 (ULYSIS Product Information Sheet describing only oligo- and polynucleotides.))

To blur this stark difference between what Claim 1 teaches and what MPI's ULYSIS Kits incorporate, Enzo conflates (1) the single labeled nucleotide, which is contemplated by Claim 1, with (2) the result that is achieved when that single labeled nucleotide is incorporated into an oligo- or polynucleotide (like DNA and RNA), which is contemplated by Claims 2 and 3. (Jaegers Decl. Ex. 3 at Col. 31:14–32.) It could be argued that, taken together, these three Claims cover short, labeled oligo- or polynucleotides – known as hybridization probes – that are not all that dissimilar to the labeled oligo- and polynucleotides created by MPI's ULYSIS Kits. (Patent Opp. at 4 n.3, 9–10; Moore Decl. Ex. 14 ¶¶ 26–27; *see also* Patent Opp. at 4 (noting 40 references to hybridization probes in Enzo's statements to the PTO (citing Moore Decl. Exs. 12,

13)); Moore Decl. Ex. 7 (Enzo's March 2007 opposition to summary judgment on infringement) at 35 (describing that the nucleotides "required by claim 1 must be useful for making probes . . . [and must be] capable of incorporation into nucleic acids")). Unfortunately for Enzo, it has not accused the ULYSIS Kits of infringing Claims 1, 2, and 3. Enzo has accused the ULYSIS Kits of infringing Claim 1 only (*see* Jaegers Decl. Ex. 2 at Ex. 1), and the labeled oligo- and polynucleotides utilized by ULYSIS Kits do not consist of and are not the same as the single labeled nucleotides described in Claim 1.

Enzo emphasized this difference when it delineated the ground covered by Claim 1 during a statement to the PTO on May 6, 2013. Specifically, Enzo told the PTO that the '060 Patent:

> relates to hybridization probes that are formed by first labeling a mononucleotide with a detectable moiety . . . and subsequently incorporating the labeled mononucleotide into an oligo- or polynucleotide probe using a polymerase . . . .
>
> Claim 1 of the '060 Patent recites "[a] nucleotide" defined by the formula "PM-SM-BASE-Sig" and Claims 2 and 3 each recite oligo- and polynucleotides "comprising at least one nucleotide in accordance with [C]laim 1." The '060 Patent and its prosecution history make clear that [C]laim 1 is directed to mononucleotides (as opposed to single nucleotide[s incorporated into] oligo- or polynucleotides) and [C]laims 2 and 3 are DNA or RNA probes into which a mononucleotide of [C]laim 1 has been incorporated. That means that the labeled

---

[11] The Court notes that Enzo's March 9, 2005 infringement contentions asserted that the ULYSIS Kits infringed Claims 1, 2, *and* 3. (Decl. of Jennifer R. Moore, dated Aug. 12, 2013, 3816 Doc. No. 128 ("Moore Decl."), Ex. 1.) However, Enzo superseded those contentions in its December 13, 2011 contentions, which contended that only Claim 1 was infringed by the ULYSIS Kits. (Jaegers Decl. Ex. 2 at Ex. 1.)

9

mononucleotides of [C]laim 1 must exist independently prior to their incorporation into the oligo- or polynucleotide probes of [C]laims 2 and 3. . . . By distinguishing between "nucleotides" and "polynucleotides" and identifying the species of [C]laim 1 as a "nucleotide" (rather than a polynucleotide), [*C*]*laim 1 is clearly intended to cover only labeled mononucleotides*. This distinction is also found in the [C]laims themselves: by separately reciting an "oligo- or polynucleotide comprising a [C]laim 1 nucleotide" in [C]laims 2 and 3, the "nucleotide" of [C]laim 1 by implication must be a mononucleotide.

(Jaegers Decl. Ex. 6 at 6–7 (internal citations and alterations omitted, emphasis added).) In short, the '060 Patent – as a whole – may relate to hybridization probes, but Claim 1 refers only to the labeled mononucleotides that are precursors to those hybridization probes.

The question raised by MPI's motion is whether the difference between the mononucleotides of Claim 1 and the oligo- and polynucleotides of the ULYSIS Kits justifies summary judgment of non-infringement. "It is well established that determining infringement is a two-step process." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citing *Markman v. Westview Instrums., Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). "First, the meaning and scope of the relevant claims must be ascertained" by the Court. *Id.* (citation omitted). "Second, the properly construed claims [are then] compared to the accused" product, which requires a factual determination. *Id.* (citation omitted). However, where the composition of the allegedly infringing process is undisputed, "literal infringement collapses into claim construction [and is therefore] amenable to summary judgment." *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332–33 (Fed. Cir. 1998) (citing *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)). As to claim construction, a court need not "conduct a detailed, limitation-by-limitation construction of . . . the asserted claim[]." *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001). "Such a procedure is not always necessary, [and if] the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all the other issues presented by the parties." *Id.* The Court need only construe the claim "to the extent necessary to determine whether the accused [product] infringes." *Id.*

Here, the parties do not dispute the relevant feature of the ULYSIS Kits – namely that they "react with . . . bases in DNA, RNA, PNA and oligonucletoides to provide a stable coordination complex between the nucleic acid and the fl[u]ourosphere label" – nor do they contest that the ULYSIS Kits do *not* label mononucleotides. (Patent 56.1 Stmt. ¶¶ 17, 22.) Because the features of the accused product are not in dispute, the Court may construe Claim 1 and then compare it to the undisputed features of the ULYSIS Kits. *See QSound Labs, Inc.*, 157 F.3d at 1332–33.

In construing Claim 1, Enzo's statements before the PTO are not alone dispositive. "[T]he court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims," before turning to the record before the PTO, even though that record "is often of critical significance in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.*, 90

10

F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman*, 52 F.3d at 979–980); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (emphasizing that Courts must view "the totality of the prosecution history . . . , not the individual segments of the presentation made to the Patent and Trademark Office"). As it turns out, though, the language of Claim 1 aligns with Enzo's statements to the PTO. Claim 1 refers to a single "nucleotide," which clearly distinguishes it from chains of nucleotide residues such as DNA and RNA. (Patent 56.1 Stmt. ¶ 3; Jaegers Decl. Ex. 3 at Col. 31:14–28.) Likewise, Enzo's statements to the PTO clearly distinguish between the hybridization probe contemplated by the '060 Patent as a whole and the single labeled nucleotide contemplated by Claim 1. (Jaegers Decl. Ex. 6 at 6–7.) Based on the record before the Court, Enzo's statements to the PTO have not been wrenched from their context or mischaracterized; rather, they clearly set forth a difference – evident on the face of Claim 1 – between Claim 1 and the accused features of the ULYSIS Kits. Accordingly, the Court concludes that the ULYSIS Kits do not infringe Claim 1 of the '060 Patent.

## III. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT MPI's and Orchid's motions for summary judgment are GRANTED in full. The Clerk of the Court is respectfully directed to terminate the motions pending at Doc. Nos. 101, 119, and 126 of 03 Civ. 3816, as well as Doc. No. 86 of 03 Civ. 3819.

In light of this Memorandum and Order and the Court's September 24, 2012 Memorandum and Order, IT IS FURTHER ORDERED THAT, by December 20, 2013, MPI and Orchid shall separately coordinate with Enzo to submit joint letters setting forth the parties' views as to what, if any, claims remain in their respective cases.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: December 6, 2013
New York, New York

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-6-13
```

\*   \*   \*

Enzo is represented by Michael Burrows, Jennifer R. Moore, Scott J. Bornstein, Jonathan D. Ball, Ronald D. Lefton, Richard C. Pettus, Roy Taub, Jeffrey R. Mann, and Justin A. MacLean of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, and Victor H. Polk, Jr., of Greenberg Traurig, LLP, One International Place, Boston, Massachusetts 02110.

MPI is represented by Matthew D. Murphey, Eric M. Jaegers, and Heather Morehouse Ettinger of Troutman Sanders, 11682 El Camino Real, Suite 300, San Diego, California 92130.

Orchid is represented by David E. Fialkow and Patrick T. Clendenen of Nelson Mullins Riley & Scarborough LLP, One Post Office Square, 30th Floor, Boston, Massachusetts 02109.